DELAWARE COACH COMPANY, a corporation of the State of Delaware, Defendant Below, Plaintiff-in-Error, v. LAURA M. REYNOLDS, Plaintiff Below, Defendant-in-Error.

(*January* 23, 1950.)

HARRINGTON, Chancellor, RICHARDS, C. J., TERRY, CAREY, LAYTON, J. J., and SEITZ, Vice Chancellor, sitting,

*William H. Foulk* and *Herbert L. Cobin* for defendant below, plaintiff-in-error.

*William H. Bennethum* and *Morton E. Evans* (of the firm of Marvel and Morford) for plaintiff below, defendant-in-error.

Supreme Court, No. 2, May Term, 1949.

SEITZ, Vice Chancellor, delivering the opinion of the court.

Plaintiff (defendant-in-error) recovered a judgment against the defendant (plaintiff-in-error) for injuries sustained while riding as a passenger on the defendant's trackless trolley (hereinafter called "coach"). Plaintiff was injured by being thrown to the floor of the coach when the coach stopped suddenly. Defendant did not deny the injury to plaintiff, but contended that defendant had fully explained the abrupt stop, and that, in consequence, there should have been a directed verdict for the defendant. Defendant also asserted other defenses which will be considered.

The drama, insofar as here pertinent, commenced when the plaintiff boarded one of the defendant's north bound electric coaches at Seventh and Market Streets in Wilmington. While the coach was moving slowly and smoothly up Market Street, the plaintiff prepared to seat herself. She then described what took place in the following way: "A.Why, I hadn't entirely released my hold of that stanchion, that last stanchion, but I was getting ready to turn around to sit down on that seat and before I could get entirely around or let go of the stanchion, I had loosened my grasp, I wasn't holding tightly (at this juncture the witness demonstrated by slapping her hands together). There was no sign of any slowing up, to my knowledge or perception. And just that—

putting on the brake as hard as he could put it on. I wondered. And I went to the floor like a ton of bricks.

"Q. Where did you end up? A. I ended on the floor, on my left side, facing the door.

"Q. You didn't fall right at the seat then, you traveled a distance? A. I jerked away from the seat. When you jerk you generally take a step, that you can't stand on your feet; my feet were taken from under me.

"Q. Where did your head finally land up with relation to the door? A. Right in front of the door. I heard a man say, 'Well, I thought she was going through the windshield.' But I landed right in front of the door.

"Q. You landed right in front of the door? A. Yes."
At another point in her testimony she described the nature of the stop in the following language: "A. Why, it was a very sudden stop, without any warning whatever or slowing down; it was just (at this juncture the witness demonstrated by slapping her hands together)—I didn't know what happened, until I heard him say just about taking the woman's wheel off."

Plaintiff testified, that while lying on the floor, she heard the driver of the coach say " 'I had to do it, I had to do it or I would have taken that woman's wheel off.' "

Plaintiff said that while she lay on the floor facing towards the door she saw the front part of a car to which the driver presumably referred. It was touching the car ahead and both cars appeared to be roughly parallel to the curb. Plaintiff was referring to the cars in the parking spaces paralleling the curb on the east side of Market Street.

A passenger on the coach, testifying on behalf of plaintiff, said that "The bus came to a very abrupt stop, just like he put his brakes all the way to the floor." She testified that she was jarred

from her seat, thrown to her feet, and that she wound up against the bar behind the driver of the coach. She testified that she said to the driver " 'Oh, my, what has happened?' ", and he said he had to do it to keep from hitting somebody. This same witness also testified that she did not see any car pulling out from the curb.

Plaintiff rested her case after the introduction of the evidence here outlined, plus evidence of her injuries and expenses. Defendant's motion for a directed verdict was denied and defendant then proceeded with its evidence.

The first witness for the defendant was the driver of the coach. He testified that he was proceeding north on Market Street at a speed of between 8-10 miles per hour. He then testified as to what happened as follows: "* * * And when I reached the middle of the block, or about the middle of the block—in other words, between Braunstein's, or rather Bendheim's shoe store— there was an automobile parked on the side, and I saw this wheel attempting to come out and it went out and sort of drifted back again, like it couldn't get out, to make a second attempt, and the next instant it come out again and I put my foot down on the brake; I had to keep from running into it."

The same witness was also questioned in the following manner with respect to the car pulling out from the curb:

"Q. As you were approaching up to this point where this car was that moved out, and when you first saw her move out, could you tell anything at all as to whether or not she was—did you think at that time that she was going to move all the way out? A. Well, I thought she was making an attempt to come out. I thought she was trying to get out from the parking place."

He testified on re-cross examination as follows: "A. In other words, I tooted my horn twice; I tooted my horn the first time and she ignored it and she didn't look at me and that is when I figured she wasn't paying any attention to me.

"Q. You tooted the horn when you first saw her when you were eight or ten feet from her, is that right? A. That is right. I saw that wheel move, naturally I thought she was going to stay in there and not come out. The next time she made an attempt to come out, I had to stop.

"Q. When you tooted your horn the first time did you attempt to put your brake on? A. I didn't put it on right then, no, because I wasn't right up to her."

A passenger on the coach called as a witness for defendant testified that after the coach stopped she saw a "car extending out into the street, out into the side of the bus." She also testified that the coach did not stop violently.

Another witness for the defendant, an employee of defendant, took photographs of the coach door at various angles some time after the accident, and these were admitted apparently to show that plaintiff's testimony was erroneous because it violated physical laws. Another witness for the defendant testified that the coach came to a "sudden stop". He then testified he looked out to see what had caused the coach to stop, and he said that a car had pulled out about three feet from the curb and that the left front of car was in front of the coach. He stated that the car was out in the lane of traffic, but that the woman driver in it pulled it back into the curb again.

In refusing to direct a verdict for the defendant at the close of the evidence, the trial court relied upon the Superior Court decision of *Biddle v. Haldas Bros.*, 8 *W. W. Harr.* 210, 190 *A.* 588.

The plaintiff's action is bottomed on the doctrine of *res ipsa loquitur*. Plaintiff contends that she introduced sufficient evidence to bring her within that doctrine. She concedes that in a proper case a directed verdict may be entered at the close of the defendant's evidence. She says, however, that the trial court here could not properly have directed a verdict because there was a ma-

terial dispute as to the truth of defendant's explanation for the sudden stop and there was evidence of negligence on the part of the defendant's driver.

Defendant contends that the doctrine of *res ipsa loquitur* was not applicable because the situation was not under the exclusive management and control of defendant's coach driver. Defendant next contends that a new trial should have been granted because the verdict was against the weight of the evidence in that there was no such extraordinary or violent stopping of the coach as to warrant the application of the doctrine of *res ipsa loquitur*. Finally, defendant contends that, assuming the doctrine is applicable, the defendant introduced evidence which constituted a full and legally justifiable explanation for the stop. Defendant argues that because this explanation was not rebutted by any evidence, a directed verdict should have been entered.

Before considering the issues for determination, we pause to note points of law which were briefed at length by defendant. Defendant first argues that in Delaware a trial court has the power to enter a directed verdict for defendant in a *res ipsa loquitur* case. Plaintiff in her brief agrees with defendant that in a proper case our trial court has the power to direct a verdict for defendant. We need only decide here whether this particular case was properly submitted to the jury.

Defendant next argues that the doctrine of *res ipsa loquitur* gives rise to an inference and not a presumption of negligence—plaintiff agrees and the trial court so instructed the jury. Consequently, there is no need to consider this point further, except to point out that the inference theory is now well established in this jurisdiction.[1] We regard the following quotation from *Sweeney v. Erving*, 228 *U.S.* 233, 240, 33 *S.Ct.* 416, 418, 57 *L.Ed.*

---

1. It is not necessary to decide whether there are cases where the evidence is so strong as to call for a presumption rather than an inference. See Prosser, The Procedural Effect of Res Ipsa Loquitcr, 20 Minn. Law Rev. 241, 261, 262. The evidence here is not sufficiently strong to consider whether that principle should be recognized.

815, as an acceptable explanation of the inference theory: "In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipso liquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

The trial court charged the jury in substantially this language and there was no error in so doing.

Defendant urges that the doctrine of *res ipsa loquitur* should not have been applied to this case because (1) there was no such sudden or violent stop as the doctrine envisages and (2) the "situation" was not under the defendant's exclusive control as the doctrine requires.

As is indicated in Biddle v. Haldas Bros., supra, and the Delaware cases cited therein the doctrine of *res ipsa loquitur* is available to a plaintiff in those situations where the facts and circumstances surrounding the occurrence of the injury warrant the inference of negligence on the part of the defendant. It is a rule of circumstantial evidence. This means that a court examines the particular manner in which the plaintiff alleges the injury to have occurred and determines whether in the "usual course of events" reasonable people would conclude that the injury would probably not have occurred in the absence of some negligence on the part of the defendant. This is coupled with the belief that the situation is of such a character that defendant should be required to show that the act was not occasioned by his negligence. Essentially then, the doctrine has a flexibility in application which de-

pends upon the court's evaluation of the situation presented. It is neither possible nor desirable to formulate any more clear cut rule defining explicitly those situations in which the doctrine of *res ipsa loquitur* is available.

In order to resolve the problem presented by the defendant's objections, we must first determine whether a passenger who is injured on a coach as a direct result of a violent stop is entitled to rely on the doctrine of *res ipsa loquitor*. The problem can perhaps be simplified by viewing the evidence at the close of plaintiff's case. Plaintiff introduced evidence which, if believed, showed that she was injured while riding as a passenger on defendant's coach as a direct result of a violent stopping of the coach. Is it fair in this situation, by analogy to the cases involving railroads, to conclude that such a plaintiff is entitled to the benefit of the inference of negligence on the defendant's part? While it is true that the occasions for violent stopping without fault on defendant's part are much more numerous in the case of a coach than a train, nevertheless, where the stop is so violent as to result in injury to a passenger exercising reasonable care, we feel that it entitles plaintiff to the benefit of an inference of negligence on defendant's part. *Karsey* v. *City of San Francisco*, 130 *Cal. App.* 655, 20 *P.2d* 751. Other reasons for our conclusion are found in the duty of a paid carrier to transport safely and in the probability that the carrier is in a better position than a passenger to explain the cause of the violent stop. See 10 *Am. Jur., Carriers,* § 1624. We do not believe that the plaintiff was required to show affirmatively that the violent stop was the result of a breakdown in some mechanism on the carrier or because of some other mechanical defect.

Let us consider whether plaintiff's evidence entitled her to rely on the doctrine of *res ipsa loquitur* in the sense that it would prevent a non-suit or directed verdict at the close of plaintiff's evidence.

Under the Delaware law the plaintiff's evidence as to the na-

ture of the stop must be of such character as to reasonably warrant the jury in concluding that the stop was so violent as to result in injury to a passenger exercising reasonable care. See *Cannon v. Delaware Electric Power Co., 2 Terry 415, 24 A.2d* 325; *Winter v Pennsylvania Railroad Power Co., 5 Terry 429, 61 A. 2d* 398.

The evidence was in real conflict as to the suddenness and violence of the stop which caused the plaintiff's fall. There was sufficient evidence, if believed, to warrant the jury in concluding that the stop was sufficiently violent to meet the requirement of the Delaware law in that respect. We feel that the plaintiff's evidence as to the nature of the stop was sufficient to bring her within that aspect of the doctrine, of *res ipsa loquitur*.[1]

Plaintiff's evidence clearly demonstrated that she was injured as a direct result of the violent stop and that she was a passenger. Plaintiff was, therefore, entitled to rely on the doctrine of *res ipsa loquitur* as we here define that term.

The defendant contends that the doctrine has no application to this case because the "situation" was not under defendant's exclusive control in that the car which, under the defendant's testimony, pulled out and thereby required the sudden stop was part of the situation. It is important to determine where such evidence fits into the scheme of a *res ipsa loquitur* case.

The answer to this problem requires some consideration of the procedure in a trial where the plaintiff is relying upon the doctrine of *res ipsa loquitur*. In the ordinary *res ipsa loquitur* case the plaintiff introduces evidence showing that he was injured as a result of some "force" apparently under defendant's control and that the "force" does not ordinarily cause injury in the absence

---

1. We are not called upon to decide those situations where the plaintiff relies upon the suddenness of the stop as constituting evidence of negligence apart from the doctrine of *res ipsa liquitur*. *See* 10 *Am. Jur., Carriers,* § 1344 and compare *Cannon* v. *Delaware Electric Power Co., 2 Terry 415, 24 A. 2d. 325.*

of some negligence in its handling. If the court feels that plaintiff has presented a situation where the doctrine applies, then what is the status of the matter at the close of plaintiff's case? Ordinarily the defendant's explanation, if any, will not be before the court, and yet at least for purposes of considering a motion for non-suit the plaintiff has made out a cause of action. Thus no non-suit or directed verdict can be granted in this situation.

We now go forward with the trial and consider the situation at the close of all the testimony. Defendant generally introduces uncontradicted evidence tending to show that the "force" was released through no fault of defendant. Take for example the situation where a plaintiff passenger on a common carrier is injured by the shattering of a window and the defendant carrier shows that the window was shattered by a bullet fired by a person having no connection with defendant. According to the defendant in the case at bar, the example would not constitute a *res ipsa loquitur* case because the "situation" was not under defendant's exclusive control. Conceding that the situation was not under defendant's exclusive control, it is apparent that the "explanation" has come from the defendant. While it might be argued that the defendant's explanation was such as to show that plaintiff was not entitled to the benefit of the doctrine, nevertheless, we feel that for purposes of terminology at least, it should be determined at the close of plaintiff's case whether or not the doctrine of *res ipsa loquitur* is applicable. We prefer to consider defendant's "explanation" not in connection with the terminology *res ipsa loquitur*, but as evidence to be evaluated by the trial court in determining whether a verdict should be directed for the defendant, or the evidence left to the jury for its evaluation.

While the action of the "parked" car may be said to be a part of the situation, nevertheless, we do not believe that its actions prevent the application of the *res ipsa loquitur* doctrine to

this case as we have here defined that doctrine. We feel that the doctrine only requires the plaintiff to show that the thing which caused the injury was under defendant's control. See *Biddle* v. *Haldas Bros., supra.* There was obvious compliance with that requirement here.

Summarizing, we feel that the question of the applicability of the doctrine of *res ipsa loquitur* should be determined at the close of plaintiff's evidence. The defendant's evidence showed that the actions of the "parked" car occasioned the sudden stop. As we view it, this evidence cannot be considered in determining whether this is a *res ipsa loquitur* case, but only in determining whether the evidence entitled the trial court to direct a verdict for defendant.

We now consider whether defendant's explanation, when considered in the light of all the evidence, was of such a character that the court should have directed a verdict for the defendant. We conclude that before a defendant is entitled to a directed verdict he must produce evidence which will destroy the inference of negligence, or so completely contradict it that the jury could not reasonably accept it. The evidence necessary to do this will vary with the strength of the inference and the nature of the explanation. See 38 *Am. Jur., Negligence,* § 355; *Prosser. The Procedural Effect of Res Ipsa Loquitur,* 20 *Minn. Law Rev.* 241.

The defendant, of course, is not entitled to a directed verdict merely because it has introduced evidence in explanation and such evidence has not been rebutted by plaintiff. One of the reasons for the application of the doctrine is that plaintiff is not in a position to offer evidence as to the facts surrounding the violent stop. Consequently, the reasonableness of the defendant's explanation though unrebutted will generally be for the jury, except in those cases where it would be highly unreasonable

to permit the jury to infer negligence in the light of all the evidence. See *Karsey v. City of San Francisco, supra.*

Under the evidence here presented, was it highly unreasonable to permit the jury to infer negligence on the defendant's part? Plaintiff contends that a dispute as to a material question of fact existed and was resolved by the jury in plaintiff's favor. This disputed material fact, according to plaintiff, arose from the conflicting testimony as to the position of the car which had allegedly required the sudden stop of the coach. Plaintiff also contends that the jury was warranted in finding negligence from the failure of defendant's driver to reduce his speed, presumably by applying the brakes, when the car first pulled out. Let us consider the evidence and see whether it raised material issues of fact for the consideration of the jury. If it did, then obviously the trial Judge properly refused to direct a verdict for defendant, even though we should find that the reason assigned for so doing was unsound.

Plaintiff testified that the front of the car which defendant contends caused the sudden stop was up against the rear of the car parked in front of it. At least two of the defendant's witnesses testified that the car pulled out from the parking space and thus necessitated the sudden stop. Did this evidence create a conflict to be resolved by the jury? A conflict existed because of the clear inference that the other car could not have pulled out and necessitated the sudden stop, assuming the truth of plaintiff's evidence as to its physical position almost immediately after the stop. Consequently, if plaintiff's testimony was believed, the defendant's testimony as to the necessity for the sudden stop had, as a practical matter, to be rejected since there was no evidence of such a time lag as could permit such action as would reconcile the two versions.

Defendant's brief seems to ignore this point. But as we understand the position taken on this point by the defendant

at the oral argument, it was that there was no real conflict because plaintiff's testimony was so contrary to the probabilities that it was unworthy of belief. This court is not prepared to say that the evidence was not for the jury to resolve. This is particularly true because it involved credibility where there was a conflict. Moreover, plaintiff's testimony was not so improbable or contrary to physical laws that the trial court was under a duty to refuse to permit the jury to evaluate it. The existence of this factual conflict, therefore, properly required the submission of the case to the jury.

We also feel that other evidence introduced by the defendant in explanation of its agent's actions was susceptible of the conclusion that defendant's driver did not exercise reasonable care even under his version of the matter. He testified unequivocally that the driver of the car did not look at any time; that the car came out and drifted back again "like it couldn't get out"; and that he didn't apply his brakes until the car started out a second time. He further testified that he blew his horn when the car pulled out from the curb the first time. However, he tesified that the driver at no time looked at him, and he considered at the time that she drifted back the first time because she couldn't get out and was going to make a second attempt. *There was no testimony by the driver that he believed she drifted back the first time in response to his horn.*

We feel that this combination of circumstances was such that it was for the jury to consider when the driver should have applied his brakes so as to slow the coach even more when the car first ·pulled out. In view of the driver's own testimony, we feel that reasonable men could differ on the question as to whether the driver was entitled to assume that the car might not pull out again and necessitate a very sudden stop. So viewed, we conclude that it was for the jury to decide whether there was lack of due care in failing initially to check the speed of the coach

even more than was done. Compare *Foley* v. *Reading Co.*, 348 *Pa.* 485, 35 A. 2d 315.

We thus conclude that it was entirely reasonable for the trial court to submit this case to the jury.

The judgment of the Superior Court is affirmed.

Feb. 3. Motion for re-hearing denied.